FILED

OCT 1 2025

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
YOUNGSTOWN

JUDGE PEARSON

MAG. JUDGE HENDERSON

4:25 CV 02086

# 1983 Complaint

## United States District Court:

Northern District of Ohio

**Plaintiff:** Yusef-Malik E. Myrick

v.

**Defendants:** J. Ellis, D. Fender, J. Crenshaw, J. Frazini, B. Douglas, W .Potter, C. Kozicki, J. Camerot, K. Ross, J. Sabo, J. Hall, A. DeGeorge, C. Blair, Core Civic, North-East Ohio Correctional Center (NEOCC).

## Jurisdiction:

The suit that is brought forward is pursuant to U.S.C 42 Section 1983 seeking a declaratory judgment and an injunction to redress the past deprivation and to prevent the future deprivation by the defendants and their agents – acting under color of State law or ordinance – of the rights, privileges, and amenities secured by the Constitution of the United States, namely the Due Process and Equal Protection clauses of the 14th Amendment, as well as the Cruel and Unusual Punishment, Neglect, and Failure to Protect clauses of the 8th Amendment.

## Venue:

The named venue is appropriate in accordance with U.S.C 28 Sections 1331 and 1343(1) (a)(3).

## Parties:

**Plaintiff:** Yusef-Malik E. Myrick is an was at all times mentioned in this Complaint a Federal Pretrial Detainee in the custody of NEOCC.

## Defendants:

**Defendant #1:** J. Ellis was at all times mentioned in this complaint the Managing Director of NEOCC. He was responsible for the actions and day-to-day operations of the Warden and the administrative team at NEOCC. He was also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #2:** D. Fender is and was at all times mentioned in this complaint the Warden of NEOCC. He is responsible for the actions and day-to-day operations of the administrative team at NEOCC and the facility itself. He is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #3:** J. Crenshaw is and was at all times mentioned in this complaint the Assistant

Warden of NEOCC's Marshal side. He is responsible for the actions and day-to-day operations of the administrative and unit teams and staff on the Marshal side, as well as the entire Marshal side itself. He is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #4:** J. Frazini is and was at all times mentioned in this complaint the Assistant Warden of Operations. She is responsible for the actions and day-to-day operations of the administrative and investigative teams at NEOCC. She is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #5:** B. Douglas is and was at all times mentioned in this complaint the Chief of Security on NEOCC's Marshal side. He is responsible for the actions and day-to-day operations of the staff and the segregation unit on the Marshal side. He is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #6:** W. Potter is and was at all times during this complaint a Captain at NEOOC. He is responsible for the operations of the entire facility and the actions of all staff during his shift. He is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #7:** C. Kozicki is and was at all times mentioned in this complaint a Lieutenant at NEOCC. Se is responsible for the operations of the entire facility and the actions of all staff during her shift. She is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #8:** J. Camerot was at all times mentioned in this complaint a Sergeant at NEOCC. During this time he was a Sergeant assigned to the the Marshal side segregation unit. J. Camerot is now a Correctional Counselor on the unit in which the Plaintiff was placed upon returning to NEOCC in March of 2025. At the time of this complaint, J. Camerot was responsible for the operations of the RHU and actions of the staff within the Restrictive Housing Unit during his shifts. He was also responsible for the safety and security of every individual – staff and inmate alike – within the RHU. He is now responsible for the operations of the his assigned Housing Unit and actions of the staff within that unit during his shifts and the safety and security of every individual – staff and inmate alike – within the unit.

**Defendant #9:** K. Ross was at all times mentioned in this complaint a Correctional Officer at NEOCC. He is now a Sergeant. He is and was at the time of this complaint assigned to the Restrictive Housing Unit. He was responsible for the day-to-day operations in the RHU, as well as the safety and security of every inmate in the RHU. He is now responsible for the operations and the actions of the staff within the RHU, as well as the safety and security of every individual – staff and inmate alike – within the RHU.

**Defendant #10:** J. Sabo is and was at all times mentioned in this complaint a Unit Manage on NEOCC's Marshal side. She is responsible for the day-to-day operations of the Unit Team under her as well as their actions. She is also responsible for the safety and security of every individual – staff and inmate alike – on the Marshal side.

**Defendant #11:** J. Hall was at all times mentioned in this complaint a Sergeant at NEOCC. At the time of this complaint, he was the head the head Sergeant of the RHU. He is now a Lieutenant at NEOCC. He was responsible for the day-to-day operations of all activities in the RHU, as well as the actions of every staff member – Sergeant or Officer – under him within the RHU. He was also responsible for the safety and security of every individual – staff and inmate alike – within the RHU. He is now responsible for the operations of the facility during his shift as well as for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #12:** A. DeGeorge is and was at all times mentioned in this complaint a Correctional Counselor at NEOCC. She is responsible for the operations of the her assigned Housing Unit and actions of the staff within that unit during her shifts and the safety and security of every individual – staff and inmate alike – within the unit.

**Defendant #13:** C. Blair is and was at all times mentioned in this complaint the Managing Director of NEOCC. He is responsible for the actions and day-to-day operations of the Warden and the administrative team at NEOCC. He is also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #14:** Core Civic Inc. – FKA Corrections Corp of America – is the owner and operator of North East Ohio Correctional Center. They are responsible for the actions and day-to-day operations of the Managing Director, Warden, and the administrative team at NEOCC. They are also responsible for the safety and security of every individual – staff and inmate alike – within the facility.

**Defendant #15:** North-East Ohio is Correctional Center is the facility in which the Plaintiff's rights were violated and represents the administrative team.

Each and every defendant is sued in both their individual and official capacities.

## Statement of The Facts:

1    On July 22nd, 2024, The Plaintiff was housed in the segregation unit of NEOCC's Marshal side (Alpha 9). On this night, the Plaintiff was out performing his duties as a detainee worker. On this night, there was another detainee who was refusing to leave the showers to allow the transgender detainee worker to utilize their PREA rights to a private shower. The Plaintiff grew upset that the officer working – Defendant #9 – was allowing this to happened, and attempted to intervene. When speaking calmly

failed and the other detainee started screaming at the transgender individual, the Plaintiff unplugged the phone. The other detainee who was initially refusing to leave the showers then demanded that Defendant #9 take him out to work – this individual was also an approved worker. The Plaintiff made it clear to Defendant #9 that if the other individual was allowed out, he (the Plaintiff) would likely be assaulted. The Plaintiff then went outside to the rec cages to check on a different individual who was out there. After about five minutes, the other individual asked the Plaintiff to get him some water from inside. Upon returning, the Plaintiff saw that the individual who had refused to leave the showers was now out as a worker. The individual started advancing on the Plaintiff. The Plaintiff began backing up. When he saw that the individual, he began calling for Defendant #9. He had to yell several times despite the fact that the Defendant was only approximately 20 feet from him. Defendant #9 pushed the Plaintiff outside and locked the door. After approximately 10 minutes, Defendants 6 and 9 pat searched the Plaintiff then allowed him back inside. After having a few words with a detainee, the Plaintiff went to the desk to speak to Defendant #9. At this point, the individual who was refusing to leave the showers was back in them – rather than being in his cell. The individual then pulled out a bottle of urine and threw the contents on the Plaintiff in front of Defendant #9, who refused to do anything about it. This caused the Plaintiff to become irate. He went to his cell, retrieved a bottle of feces and dumped its contents inside the individuals cell. Defendant #9 then attempted to physically place the Plaintiff in his cell.

**2**      On July 23rd, 2024, the Plaintiff submitted a grievance stating that at approximately 10:00 PM on July 22nd, 2024, he was assaulted by Defendants 6-9. Specifically, the Plaintiff states that the assault started when Defendant #9 grabbed the Plaintiff, attempting to pull him to his cell. When the Plaintiff pushed away, Defendant #9 then struck him with closed fists in the face and head repeatedly. At this time, Defendant #8 came up from behind the plaintiff and slammed him on the ground, then laid his upper body weight across the Plaintiff's upper body, his forearm pressed against his throat. Cutting off air circulation. During this time,  Defendant #9 continued striking the Plaintiff in the face and head. The assault then continued when Defendants #6 and #7 arrived. The Plaintiff reports that Defendant #7 grabbed the chain in the middle of his leg restraints and lifted them up, causing the metal to "bite into" his skin. The Plaintiff further reported that once hand restraints were applied, Defendant #8 hooked his fingers around the chain of the handcuffs and started dragging the Plaintiff across the floor, until Defendant #6 told him to stand him (the Plaintiff) up. Once standing, the Plaintiffs reports that Defendant #6 wrapped his arm around his throat, cutting off air circulation while Defendant # 7 posed as if to strike the Plaintiff. The Plaintiff then stated he was placed in his cell and left completely restrained – handcuffed and shackled – for approximately 45 minutes. Finally, the Plaintiff states that not only do these actions

constitute excessive force, but that he was assaulted by NEOCC officers, and that the events were all on camera and occurred in front of two other detainees.

3    The Plaintiff's requested actions consisted of an explanation as to why Defendant # 9 was still employed, a review of camera footage, the detainee witnesses interviewed, and the facility's assistance in pressing criminal charges against Defendants 6-9.

4    On 8/11/24, Defendant #10  responded to the Plaintiff's grievance . In this response, Defendant #9 states that she "reviewed the 5-1-A (Conduct report) packet to investigate the incident." Defendant #9 also states that "staff made attempts to escort you back to your cell where you became resistant and uncooperative," and that "staff called assistance due to your behavior". Finally, Defendant #9 states "your incident will be forwarded to SIS for further review," and "rejected" the Plaintiff's grievance.

5    On 8/11/24, the Plaintiff filed his first level of appeal. In his appeal, the Plaintiff asks why footage was not reviewed, nor the two named detainee witnesses interviewed. The Plaintiff also states that when he told Defendant #8 to tell the Correctional Counselor serving the initial response from Defendant #10 what he saw happen, Defendant #8 claimed he "did not remember", then threatened the Plaintiff in front of the Correctional Counselor and one of the detainees who saw the events of 7/22/24.

6    On 8/20/24, Defendant#2 responded to the first level appeal. In his response, Defendant #2 claims that the "facility cameras were unable to capture this incident due to updates being performed by off-site contractors". He then says "a review of your grievance, appeal, and corresponding documents have been used to investigate your grievance issue." Defendant #2 then states, "It has been determined that on 7/22/24, Alpha 9 officers attempted to escort you back to your cell. During this time, you then became irate, refused verbal directives, and attempted to assault the escorting officer." Defendant #2 goes on to say, "staff utilized physical handling techniques to guide you to the floor. Upon additional staff entering, mechanical hand and leg restraints were utilized. Staff documentation shows that once you were placed in mechanical leg restraints, your legs were held down briefly to prevent you from kicking staff." Finally, Defendant #2 then says, "I have ensured this incident was investigated thoroughly and staff performed according to their job duties... Your claim of excessive force is unfounded, staff used the least amount of force necessary to regain control".

7    On 8/20/25, the Plaintiff submitted his second level appeal to defendant #1. The Plaintiff sates, "Fender (Defendant #2) states that 'it has been determined',but fails to state how it was 'determined'. All Fender is going off is staff word. I (the Plaintiff) have asked for multiple detainees to be interviewed, yet that has not happened."

8    On 8/26/24, Defendant #1 responded to the Plaintiff's appeal. Defendant #1 states, "I have reviewed your grievance information and Warden Fender's response provided to you. On August 21st,

2024, we spoke at length about your grievance issue and the Use of Force that took place involving you and other officers. Based on our meeting, along with my review, I agree with Warden Fender's decision". This was the highest level of appeal.

9 On 9/8/24, the Plaintiff submitted a grievance stating, "Due to Officer Kurtz recently submitting a 5-1-C statement substantiating some of the claims listed in grievance #24-581 (grievance and appeals submitted between 7/23-8/26/24), I want this matter re-investigated entirely." The Plaintiff then asserts, "The 5-1-C was submitted to SIS Jones".

10 The Plaintiff's requested actions were for the matter to be completely re-investigated, staff to be held accountable, and for the facility's assistance in the pressing criminal charges against each officer.

11 On 9/12/24 Defendant #5 responded to this grievance. Defendant #5 states "Your previous grievance concerning this same issue was reviewed through the entire grievance process and this statement does not change the findings."

12 On 9/12/24, the Plaintiff submitted his first level of appeal. The Plaintiff states, "The fact that a fifth officer came forward proves that this matter was not properly investigated. I did launch a complaint with Corporate". The Plaintiff was released from NEOCC's custody before a response was given.

13 On 9/10/24, the Plaintiff submitted a grievance regarding being illegally housed in segregation. The Plaintiff states that he believed he was being retaliated against on two separate levels. The first level of retaliation he believed was Defendant #12 retaliating against him for both her failed disciplinary report on 9/4/24, as well as for the Plaintiff reporting her for violating facility policy by allowing multiple detainees in the bubble alone with her. The Plaintiff believes this to be true because on 9/7/24, Defendant #12 then had the Plaintiff brought to segregation without cause, then immediately released another detainee whom the Plaintiff had placed a separation on due to PREA concerns back onto the Plaintiff's assigned housing unit, making it so the Plaintiff either had to go to a unit he was unsafe on or be forced to stay in segregation. The second level of retaliation, the plaintiff believes, was administration retaliating against the Plaintiff for reporting their lack of an investigation for Grievance #24-581 to Corporate (Core Civic Inc.). The Plaintiff believes this because both Defendants 4 and 5 allowed Defendant #12 to place the Plaintiff in Segregation and immediately place the other detainee back onto the Plaintiff's assigned unit, as well as the fact that the same Defendants kept the Plaintiff in Segregation for several days before the grievance was filed, without a disciplinary report to substantiate keeping him there. The Plaintiff was transferred out of NEOCC custody before receiving a response. His requested action was for immediate release from segregation.

14 On 4/16/25, the Plaintiff placed a grievance regarding Grievance #24-829, and that he believes that a response not being given in the 7 day period given to administration was, in fact, intentional. The

Plaintiff says that he believes this was to deliberately dismiss the fact that he was held in segregation illegally for multiple weeks without proper documentation. The Plaintiff's requested actions were to be given an explanation for being illegally held in segregation and for compensation for the violation of his Due Process rights.

15    On 4/22/15, Defendant #3 responded to the Plaintiff's grievance. In his response, Defendant #3 claims that the Plaintiff's "behavior determined (his) housing in RHU. Defendant #3 then denied the grievance.

16    On 5/9/25, the Plaintiff submitted his first level appeal. In this appeal, the Plaintiff asks specifically what behaviors placed him in segregation. The Plaintiff then reiterates what was stated in the initial grievance regarding this matter – Grievance #24-829 – stating that he was never issued a disciplinary report from 9/7/24, nor was a disciplinary report completed. He then states that he was not under any type of investigation, therefore should not have been placed in segregation. The Plaintiff is quoted as saying "I was being illegally held in segregation, then was surreptitiously transferred" (to another facility).

17    On 5/15/25, Defendant #2 responded to to the appeal. In his response Defendant #2 states that the Plaintiff received a disciplinary report for threatening a staff member. Defendant #2 then states "The conduct report in question was expunged due to errors within the report". Finally, Defendant #2 says that the Plaintiff did receive a conduct report while housed in segregation for "abusive language", which the Plaintiff plead guilty to "before being released from this facility"/

18    On 5/16/25, the Plaintiff submitted his second level appeal. In the appeal, the Plaintiff first corrects Defendant #2, stating that the initial report was for "failure to follow orders" and "disrespect to staff", then states the name of the officer that wrote the report. The Plaintiff then states that that particular ticket could not have been "expunged due to errors within the report" because only the DHO – Designated Hearing Officer – can expunge tickets, and the DHO has no record of this report because it was never served to the Plaintiff.

19    On 7/17/25, The Plaintiff received a response from Defendant# 13. In this response, Defendant #13 states "Your grievance is denied. Your housing is appropriate", completely ignoring the fact that this grievance was relating to prior housing in segregation and has nothing to do with the Plaintiff's current housing.

20    On3/31/25, the Plaintiff submitted a grievance stating that he was assaulted by Defendant #7 on the same date (3/31/25). The Plaintiff then states, "Specifically in the A 2/4 sallyport at approximately 2:40-2:45 PM Camerot punched me in the face" The Plaintiff then states that this is not the first time that this officer assaulted him, mentioning a witness statement from another officer submitted on or about

9/5-9/8/24

21 The Plaintiff's requested action was for the facility's assistance in pressing criminal charges against Defendant #7.

22 On 4/2/25, Defendant #5 responded to the Plaintiff's grievance, Though the handwriting is hard to read, Defendant #5's response appears to be a blanket response guaranteeing an investigation into the matter.

23 On 4/2/25, the Plaintiff reiterates that this incident was not the first time he was assaulted by Defendant #7, and that he would not allow the facility to "shrug it off". This was his first level of appeal.

24 On 4/8/25, Defendant #2 responded to the appeal, stating that an investigation was ongoing, and that "any misconduct found will be addressed accordingly". He then says, "Corrective or disciplinary action is not information that detainees are entitled to".

25 On 4/8/25, the Plaintiff submitted his second level of appeal. The Plaintiff states, "Considering that I am still in segregation, I find it hard to believe that any 'investigation' will be taken seriously. Please reference grievance #24-805. Despite new information – which was completely ignored – this facility still found no fault on the officers involved. I believe this will happen yet again."

26 On 5/2/25, Defendant #1 responded to the appeal, stating that on 4/30/25, he attempted to speak with the Plaintiff about the grievance, and that the Plaintiff refused. Defendant #1 then states that he concurred with Defendant #2, and that "the appropriate measures were taken regarding this situation".

27 On 3/31/25, the Plaintiff received a disciplinary report from Defendant #7.In this report, Defendant #7 alleges that the Plaintiff spit in his face committing assault. The Plaintiff was placed in segregation on the same date for this report.

28 4/13/25the Plaintiff submitted a disciplinary appeal form stating, "Camera footage not only shows that I in fact did not spit on anyone, but that Camerot did assault me.

29 On 4/17/25, Defendant #3 responded to this appeal. In his response, Defendant #3 admits to seeing Defendant #7 assault the Plaintiff by "pushing" him. Defendant #3 then states, "The disciplinary report states you spit in the sergeant's face when you approached him".

## Statement of the Case

1 Facts 1-8 are relevant to 1983 by violating the Plaintiff's 8th amendment right to be free from cruel and unusual punishment. Both the amount of force and the administration's extensive efforts to cover up constitute both cruel and unusual punishment.

2 Facts 9-12 are relevant to 1983 by violating the Plaintiff's equal protection rights, secured by the 14th amendment. By refusing to re-investigate the matter after a witness came forward with new evidence,

the administration ignored facts that would **have** otherwise kept the Plaintiff from being assaulted later (facts 20-29).

3      Facts 13-19 are relevant to 1983 by violating the Plaintiff's right to due process, protected by the 5th and 14th amendments, on two levels. Firstly, by placing the Plaintiff in segregation without a disciplinary report, thus denying him the ability of a hearing, administration unjustly and illegally violated his due process rights. Secondly, by policy, Defendant #3 had 30 calendar days to respond to the Plaintiff's second level appeal. This would have been from 5/16/25- 6/15/25. Instead, the Defendant took 62 days to respond, giving himself extra 32 days without an extension notice. Furthermore, this Defendant did not even address the Plaintiff's concern in his response.

4      Facts 20-29 are relevant to 1983 by violating 8th amendment right to be free from cruel and unusual punishment (failure to protect) and his 14th amendment right to equal protection. By placing him on Alpha 4 – where Defendant #8 is assigned as the Correctional Counselor – administration intentionally placed the Plaintiff with someone who had previously assaulted him. This constitutes both cruel and unusal punishment and denial of equal protection. By Defendant #8 assaulting the Plaintiff on 3/21/25, he violated his (the Plaintiff's) right to be free from cruel and unusual punishment.

## A Prayer for Relief

The Plaintiff prays for:

     A.) This Court to accept jurisdiction for this Complaint pursuant to 28 U.S.C Sections 1331 and 1343 (1)(a)(3).

     B.) A declaratory judgment to redress and stop all deprivations accused in this Complaint.

     C.) An injunction to stop the practice of placing detainees in the Restrictive Housing Unit without proper formal due process

     D.) An injunction requiring the staff in the Restrictive Housing Unit to wear body cameras at all times

     E.) Monetary relief of $500,000.00 in the form of compensatory damages for the emotional, psychological, and physical harm the has befallen the Plaintiff due to the accused actions in this Complaint. These acts have caused the Plaintiff an egregious amount of mental anguish and pain and suffering.

     F.) Monetary relief of $15,000.00 /day for every day the Plaintiff was illegally placed in the Restrictive Housing Unit in the form of punitive damages to discourage administration from using this as a further form of abuse.

**Print:**

Yusef-Malik E. Myrick

**Signature:**

**Date:** 9/22/25

**Notary Print:** Lindsay Caldwell

**Notary Signature:**

**Date:** 9-22-25

**Notary Seal:**